would invade the province of the jury to decide the case; jurors, relying on their own common knowledge and experience, could consider the facts and, coupled with the testimony of the lay witnesses, reach their own conclusions regarding liability. Nothing that Mr. Button would have to say would assist the jury in understanding the facts of this case. See Kline v. Ford Motor Co., 523 F.2d 1067, 1070 (9th Cir. 1975)[3] (the district court may properly refuse to admit expert opinion on the ultimate issue based on its assessment of the borderline value of the evidence to the jury). See also Johns Heating Serv. v. Lamb, 46 P.3d 1024 1038 n.60 (Alaska 2002) (citations omitted)(expert testimony is not required in non-technical situations where negligence is evident to lay people); 313 Am. Jur. 3d Expert and Opinion Evidence § 203 (expert opinion testimony should not be permitted to invade the field of common knowledge or the province of the jury).

Accordingly, defendant respectfully requests that its Motion in Limine be granted, and that Mr. Button be excluded from testifying in this case.

---

[3] Kline also noted that "[w]e agree with Professor Wigmore that the appropriate criterion for receiving opinion evidence from a qualified witness is '[c]an a jury from this person receive appreciable help?'" Kline 523 F.2d at 1070 (quoting 7 J. Wigmore, Evidence (3d ed. 1940 § 1923).

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

## VII. Conclusion

Defendant respectfully requests that its Motion for Partial Summary Judgment on Count II of plaintiff's complaint alleging negligence per se be granted.

Defendant also respectfully requests that its Motion in Limine to exclude the testimony of Richard Button be granted.

DATED this 14th day of February, 2007, at Anchorage, Alaska.

RICHMOND & QUINN
Attorneys for Defendant

By:     s/ William A. Earnhart
RICHMOND & QUINN, PC
360 "K" Street, Suite 200
Anchorage, Alaska 99501
Ph: (907) 276-5727
Fax: (907) 276-2953
wearnhart@richmondquinn.com
Alaska Bar. No. 9411099

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

DEFENDANT ARG ENTERPRISES' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT II OF PLAINTIFF'S COMPLAINT, NEGLIGENCE PER SE AND MOTION IN LIMINE TO EXCLUDE PLAINTIFF'S EXPERT
MEYER v. ARG ENTERPRISES, INC., CASE NO. 3:05-cv-00239-TMB
PAGE 12 OF 13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by mail this 14th day of February, 2007, to:

Robert J. Jurasek
PENTLARGE LAW GROUP
1400 W. Benson Blvd., Ste. 550
Anchorage, Alaska 99503

    /s/ William A. Earnhart
    RICHMOND & QUINN

2043\005\PLD\MTN FOR PSJ

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

## LIST OF EXHIBITS

DEFENDANT ARG ENTERPRISES' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON COUNT II OF PLAINTIFF'S COMPLAINT, NEGLIGENCE PER SE AND
MOTION IN LIMINE TO EXCLUDE PLAINTIFF'S EXPERT

| Exhibit No. | Description |
|---|---|
| A | First Discovery Requests to Plaintiff |
| B | Excerpts from Deposition of Richard Button, 9/28/06 |
| C | Richard C. button, P.E., Expert Witness Qualifications |
| D | Photograph |
| E | Excerpt from the 2003 International Building Code |

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

Robert J. Jurasek, Esq. ASBA 9111071
PENTLARGE LAW GROUP
1400 W. Benson Blvd., Suite 550
Anchorage, AK 99503
Telephone  (907) 276-1919
Fax:         (907) 276-8000
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA, AT ANCHORAGE

| | |
|---|---|
| MARLENE G. MEYER,<br><br>               Plaintiff,<br><br>v.<br><br>ARG ENTERPRISES, INC., aka STUART ANDERSON'S CATTLE COMPANY RESTAURANTS,<br><br>               Defendant. | Case No. A05-239 CV (JKS)<br><br>**FIRST DISCOVERY REQUESTS TO PLAINTIFF** |

      COMES NOW plaintiff, MARLENE G. MEYER by and through counsel, and pursuant to Rules 33 and 34 of Alaska R. Civ. P., to request that plaintiff in this matter answer, in writing, within thirty days (plus three if mailed) of the date of service hereof, the following requests for production and interrogatories.

      Please be advised that plaintiff is under a continuing obligation for the supplementation of the answers to these discovery requests based on newly acquired information.

INSTRUCTIONS

<u>Interrogatories</u>:

      The interrogatories set forth below are served upon you in accordance with Rules 26 and 33 of the Alaska R. Civ. P. Each interrogatory must be answered separately and in the fullest detail possible, under oath, in the spaces provided, using additional sheets as needed.

      If any interrogatory is objected to, the reasons for the objection must be stated. If the objection is made to part of an interrogatory, the part objected to must be specified.

Exhibit _____A_____

Page __1__ of __2__ Pages

| | |
|---|---|
| Opthalmic Association (Dr. Rosen) | $ 6,743.00 |
| Dr. Scott Keister | $ 715.00 |
| Providence Anchorage Anesthesia Medical | $ 1,008.70 |
| Dr. T. Ikahihifo | $ 393.00 |
| Sears Optical | $ 513.98 |
| Providence Health System | $ 4,885.68 |
| Carrs Pharmacy | $ 48.06 |
| Fred Meyer Pharmacy | $ 103.35 |
| TOTAL | $ 23,161.64 |

INTERROGATORY NO. 11: Please provide a general summary of all activities of plaintiff on the date of the accident from the time plaintiff got out of bed until the time plaintiff went to bed. In providing this summary, please provide the times each activity began and ended to the best of plaintiff's recollection.

ANSWER:

1-7-05-8:00 a.m. Went to office, did office duties.

1:00 p.m. Went to lunch at Stuart Anderson's Cattle Company with two friends.

2:30 p.m. Finished lunch and walked out the door along the sidewalk beside the building and tripped on a lip of the sidewalk and slammed my face into the cement. I was unable to get up, so I crawled to the nearest car and used the bumper of the car to pull myself up. I was stunned and since my nose was bleeding, I went to my vehicle and got some Kleenex and cleaned up myself before going back into the restaurant to report this fall to the General Manager-Kerry Young. We sat down and he wrote out an accident report. I had him come outside with me to show him where I tripped. There was some drops of my blood on the sidewalk. I drove myself to (First Care) to have my wrist/arm looked at. I thought I broke my arm. The doctor put a cast on my arm. I didn't feel so good so I called (Ruth Jessen) to pick me up from First Care Medical Center and take me back to the office (Arctic Inn Motel). I went to my room and rested for the rest of the day and night. Exhibit A

Page 2 of 2 Pages

Richard Button

3:05-CV-00239

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

MARLENE G. MEYER,

    Plaintiff,

-vs-

ARG ENTERPRISES, INC. aka STUART
ANDERSON'S CATTLE COMPANY
RESTAURANTS,

    Defendant.
_____/
Case No. 3:05-cv-00239-TMB

DEPOSITION OF RICHARD BUTTON

Pages 1 - 44 inclusive

September 28, 2006, 10:00 a.m.

Anchorage, Alaska

Exhibit B

Page 1 of 6 Pages

Page 22

1   Q. If you recall when you visited?
2   A. I don't recall. I know that I picked up
3   Mrs. Meyer and went over there to make sure that I
4   understood where the spot was. And that was -- seems to
5   me there was, at that point there was snow on the ground.
6   Q. Did you take any photographs?
7   A. Yes, I did.
8   Q. Is this your only --
9   A. Here they are.
10  Q. Is this your only copy?
11  A. You can mark it as an exhibit. I'll make a note
12  to recopy those.
13      (Exhibit 4 was marked.)
14  BY MR. EARNHART:
15  Q. Looking at the photographs in Exhibit 4, did Ms.
16  Meyer identify exactly where she fell to you?
17  A. Yeah.
18  Q. And could you identify in those photographs, it
19  looks like they've got JPG numbers underneath each photo?
20  A. Yeah, it was, the general picture would be
21  2555.JPG.
22  Q. As for a specific location or a specific piece
23  of cement or the sidewalk, did she identify?
24  A. Well, it's hard to see -- it's hard to see from
25  here. But it's -- it's back here, right next to the --

Page 23

1   it's better shown in this area right here.
2   Q. You're referring to Exhibit 3?
3   A. Right.
4   Q. And --
5   A. I have some other pictures -- I don't know, why
6   they're not in the file -- that I can produce. These
7   were just general background photos that were taken.
8   Q. Okay.
9   MR. EARNHART: Bob, can you produce those?
10  THE WITNESS: I'll get those.
11  BY MR. EARNHART:
12  Q. Looking at Exhibit 3, the first page DEF 00001,
13  did she identify specifically where she fell?
14  A. Yeah, it was right in -- right here.
15  Q. And you're pointing to --
16  A. Pointing to a piece of sidewalk, a joint that's
17  just beyond the corner of the building. I think it would
18  be the northeast corner of the building. And it's where
19  the sidewalk that runs along the east face of the
20  building joins the -- and actually comes into the
21  sidewalk that runs across the front of the building,
22  which would be the north face.
23  Q. Okay. In regard to that seam there, did she
24  identify which edge she tripped on or --
25  A. I -- if I remember correctly, it was this edge

Page 24

1   here, which she was traveling out of the building
2   traveling east on her way to her car, which is parked on
3   that side of the building. And she tripped on the edge
4   of the sidewalk that was running along the north face of
5   the building and was -- became part of the other
6   sidewalk, intruded into it, I guess, by a little bit, by
7   about two or three feet.
8   Q. She tripped on the east edge of that?
9   A. Yeah, she tripped -- well, she tripped on the
10  west edge of the sidewalk section that was running along
11  the east side of the building.
12  Q. In regard to that seam that we're talking about,
13  is it fair to say there's just one piece of cement there
14  that has the tapered edges to it? Do you recall that?
15  A. There's one piece of concrete that -- one large
16  section that's probably four-by-six or eight and, yeah,
17  where that extends into the sidewalk at the front of the
18  building, it's raised slightly and there's a rounded edge
19  there, yeah.
20  Q. Okay. Along that, the east seam there, did she
21  say -- was she more towards the north or more towards the
22  south when she fell or did she describe it at all to you?
23  A. No, she wasn't -- I don't remember her being
24  real specific. It was just right in this area here,
25  probably more -- I had the impression in talking with her

Page 25

1   that this was in this area here, more to the north end of
2   this edge.
3   Q. Okay. Did she describe her fall in any way, as
4   to what foot tripped or --
5   A. Not. What I remember, she just went over and
6   hit her face, is what was told and what I remember.
7   Q. Okay. Going back one step, have you taken any
8   courses or done any study in human factors or any of that
9   area as to how people react and how bodies react?
10  A. No.
11  Q. Have you taken any courses or any classes or
12  seminars specifically in regard to sidewalk design?
13  A. Well, we're -- I guess specifically, no. I'm
14  sure they must exist, but generally speaking, civil
15  engineers are grounded in general principles of concrete
16  and design and code requirements, and we take off and do
17  it. I mean, I've written specs for sidewalks over my
18  years of practice and they're pretty standard, pretty
19  bump and grind stuff, nothing real special about them.
20      If you want to get into super flat floors for
21  warehouses, that's a different story, but sidewalks are
22  pretty straightforward.
23  Q. When you say straightforward specs, what kind of
24  specs go into a sidewalk?
25  A. Well, you've got several sections. Obviously,

Page 30

1   It's just kind of fine tuning that drives you nuts that
2   happens.
3       In general, things move forward pretty much the
4   same. They very seldom go back and make anything less
5   restrictive.
6       Q. But sitting here today, you can't point to any
7   provisions within the 2003 IBC code that reference the
8   accessibility standard similar to 4.52 of the ADA --
9       A. Sitting here in this room right now, no. With
10  a -- given a few minutes with the code, I could probably
11  produce that, certainly for trial.
12      Q. When you measured the difference in height at
13  this particular location, how do you do your
14  measurements? Is it from the bottom of the crack between
15  the two pieces of cement or is it from a different point?
16      A. Yeah, it would be basically from -- if you've
17  got two pieces of concrete sidewalk, you'll measure from
18  the base of one to the top of the other. Basically top
19  to top, and whatever the difference is is what the
20  measurement would be.
21      Q. Okay. In regards to the piece of concrete we're
22  dealing with here, it has a general flat surface but then
23  the edges are tapered about two or three inches out.
24  What counts as the top of that block of concrete for
25  measurement purposes?

Page 31

1       A. I don't understand quite what you're saying, but
2   let's look at the picture.
3       Q. For example, the last picture in Exhibit 3, you
4   can see the tapered edge where they used a cement tool.
5       A. They flattened that out with a trawl.
6       Q. They use a trawl and it tapers down the edge
7   about a quarter to a half an inch; is that consistent
8   with your memory?
9       A. My memory is that that -- yeah, there's a gap or
10  drop there. I doubt -- it's probably not more than a
11  quarter inch, probably more than like an eighth.
12  Typically that's what they do.
13      For all intents and purposes, there's not much
14  difference between this, what you're calling a raised
15  section and the perimeter edge here. It's --
16      Q. Let's assume that there was a significant
17  difference, what counts as the top of that cement -- that
18  piece of cement for measurement purposes?
19      A. It would be the edge at the -- adjacent to the
20  slab.
21      Q. What if the gap between the two slabs was, let's
22  say, four inches, does that present different issues as
23  far as measuring the height between the slabs?
24      A. I'm not really prepared to discuss that. That
25  becomes a gap. And that affects the way people perceive

Page 32

1   things. And -- yeah, that's -- to me, I don't have an
2   opinion on how that would affect my opinion.
3       Q. Are there code provisions that apply to gaps?
4       A. You're not supposed to have gaps in an exit or a
5   sidewalk. I mean, I guess that would be the provision
6   that would apply, you're supposed to have a continuous
7   flat surface.
8       Q. But sidewalks are not continuous flat surfaces,
9   are they?
10      A. They're supposed to be.
11      Q. But they're not poured as one piece of concrete?
12      A. That is correct. But as long as they butt
13  together, they're considered continuous.
14      Q. When we say butt together, how close to do they
15  have to be together?
16      A. Ideally -- that depends on the type of joint.
17  You've got expansion joints and control joints. In this
18  sidewalk here these appear, just looking at them, to all
19  be control joints. So they would have troweled down each
20  side and created a weakened plane by breaking this joint
21  down a third of the depth of the concrete, so that the
22  crack would occur in the joint, as opposed to into the
23  surface. I'm not sure quite what happened here.
24      I don't remember, and it's not obvious from this
25  photograph, this appears to be what would be called an

Page 33

1   expansion joint. In that case they put a half-inch,
2   anywhere from a quarter- to a half-inch piece of mastic.
3   It's usually fiberboard impregnated with asphalt to allow
4   the -- for thermal expansion between the different
5   lengths of concrete so that you don't end up with a
6   buckle when it gets hot.
7       So sidewalks generally don't have a gap of more
8   than a half an inch, or they shouldn't if they're
9   constructed properly.
10      Q. Is there any specific code provisions that
11  address that gap?
12      A. No. I -- I -- other than the portions of the
13  code that say you're supposed to have a continuous
14  surface, and those provisions accept the reality of
15  construction, which is that you've got to have expansion
16  joints.
17      Q. In regard to concrete, often the edges are
18  troweled one way or another. Are there any provisions
19  regarding how the edges of the concrete can be troweled,
20  what sort of curve or how much difference --
21      A. No. Again, standard in the industry, I'm sure
22  if somebody was to go way out on a limb and put a
23  two-inch radius on the edges of their sidewalk, you know,
24  in the area of travel, that they probably would get
25  called by the Municipality.

Page 34

1    So you can go into any hardware store, Alaska
2  Industrial Hardware, and buy trowels. They've got
3  standard edges. What that radius is, I don't know. It's
4  pretty much accepted by the industry and that's what you
5  get. Probably quarter-inch radius, or something like
6  that.
7    Q. In this particular case the troweled piece of
8  concrete, it's troweled differently than the adjoining
9  pieces of concrete, correct?
10   A. It appears that there was some attempt to fill
11 in what was a flower bed or a planting area. And that
12 that -- and I say that simply because the finish on that
13 particular concrete was different than what you see
14 everywhere else.
15   Q. It appears to have been laid at a later date?
16   A. Could be a later date. Certainly a different --
17 at a different time.
18   Q. It's right on that corner where people may have
19 traveled over the flower bed, or something?
20   A. It -- as I remember it, that extends all the way
21 back -- that extends all the way back to the door. It
22 looks to me like at one time they thought they wanted to
23 have a planting bed in there. And the reality of it is
24 it's on the north side of the building. And it's
25 undercover. And things didn't grow well there. And they

Page 35

1  just ended up with an eyesore, so they filled it in. But
2  I have no basis for that, other than just -- just knowing
3  something about what grows up here, since that's one of
4  my hobbies. And I suspect that's what happened.
5    Q. I think it says in your report that it appears
6  the pieces of cement had moved due to frost heaving
7  and/or settling; is that your opinion?
8    A. I'll have to go look and see what I said.
9        Yeah, I say it was not clear whether the
10 difference was due to frost heave or settling of sections
11 of the sidewalk.
12   Q. Do you have any opinion at all as to why the
13 difference in elevation exists?
14   A. My guess is that it settled. And I say that
15 because, looking at these pictures and looking at -- my
16 pictures were taken in the winter. These pictures, I
17 don't see any snow on the ground. And I've been there
18 recently. And this is -- this piece of concrete's pretty
19 much -- stayed as it shows there. So my guess is that
20 there isn't any frost heave going on. And if there
21 isn't, it probably was settlement.
22   Q. Either frost heaving or settlement, are those
23 uncommon in sidewalk situations here in Anchorage?
24   A. Uncommon, no.
25   Q. Had you ever been to this location prior to

Page 36

1  being retained in this case?
2    A. Sure. My offices are right across the street.
3  So -- although that -- and over the years the Cattle
4  Company's been kind of a hangout, so it's gone through a
5  lot of incarnations and I was part of some of those,
6  so --
7    Q. When you say you were part of some of those, did
8  you ever participate at all in any of the design?
9    A. Not any of the design. I participated in the
10 partying that went on inside.
11   Q. Had you ever noticed that piece of concrete
12 before?
13   A. No.
14   Q. Any particular reason you would notice or not
15 notice it?
16   A. No.
17   Q. Had you ever stumbled there before?
18   A. No.
19   Q. Do you think you had crossed that location
20 before?
21   A. Probably not. I usually don't park on this side
22 of the building.
23   Q. You said several times that sidewalks are
24 supposed to be continuous surfaces. What provision of
25 the code applies to that?

Page 37

1    A. Well, the -- the sections that talk about
2  exiting talk about landings being level surfaces or
3  sloped surfaces, but not discontinuous surfaces.
4    Q. Is this considered a landing, the location of
5  this accident?
6    A. The code often speaks to general areas that --
7  that are then carried on forward. So -- so,
8  in other words, it's understood that you're not going to
9  have ups and downs in any means of egress. And this
10 sidewalk would still be considered a means of egress from
11 the building.
12   Q. When does a landing or a means of egress become
13 a sidewalk or something different?
14   A. When you exit a building and the exit opens onto
15 a sidewalk, then that becomes a means of egress.
16       And there are standards; specifications for
17 sidewalks require that they be level, that there be no
18 change in elevation between the different pieces of it
19 after it's done. And slabs are the same way, they're
20 required to be, you know, not more than quarter-inch out
21 of level in ten feet so -- they're just -- obviously, if
22 we have a sloping site, then sidewalks are going to slope
23 with the site. But within that slope, they're supposed
24 to maintain continuity of elevation, so that you don't
25 trip. That's the whole point, is trying to not trip.