UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

MARLENE G. MEYER,

    Plaintiff,

-vs-

ARG ENTERPRISES, INC. aka STUART
ANDERSON'S CATTLE COMPANY
RESTAURANTS,

    Defendant.
_____/
Case No. 3:05-cv-00239-TMB

COPY

DEPOSITION OF RICHARD BUTTON

Pages 1 - 44 inclusive

September 28, 2006, 10:00 a.m.

Anchorage, Alaska

Exhibit _C_

Page _1_ of _6_ Pages

Page 1

Page 22

1  Q. If you recall when you visited?
2  A. I don't recall. I know that I picked up
3  Mrs. Meyer and went over there to make sure that I
4  understood where the spot was. And that was -- seems to
5  me there was, at that point there was snow on the ground.
6  Q. Did you take any photographs?
7  A. Yes, I did.
8  Q. Is this your only --
9  A. Here they are.
10 Q. Is this your only copy?
11 A. You can mark it as an exhibit. I'll make a note
12 to recopy those.
13    (Exhibit 4 was marked.)
14 BY MR. EARNHART:
15 Q. Looking at the photographs in Exhibit 4, did Ms.
16 Meyer identify exactly where she fell to you?
17 A. Yeah.
18 Q. And could you identify in those photographs, it
19 looks like they've got JPG numbers underneath each photo?
20 A. Yeah, it was, the general picture would be
21 2555.JPG.
22 Q. As for a specific location or a specific piece
23 of cement or the sidewalk, did she identify?
24 A. Well, it's hard to see -- it's hard to see from
25 here. But it's -- it's back here, right next to the --

Page 23

1  it's better shown in this area right here.
2  Q. You're referring to Exhibit 3?
3  A. Right.
4  Q. And --
5  A. I have some other pictures -- I don't know, why
6  they're not in the file -- that I can produce. These
7  were just general background photos that were taken.
8  Q. Okay.
9     MR. EARNHART: Bob, can you produce those?
10    THE WITNESS: I'll get those.
11 BY MR. EARNHART:
12 Q. Looking at Exhibit 3, the first page DEF 00001,
13 did she identify specifically where she fell?
14 A. Yeah, it was right in -- right here.
15 Q. And you're pointing to --
16 A. Pointing to a piece of sidewalk, a joint that's
17 just beyond the corner of the building. I think it would
18 be the northeast corner of the building. And it's where
19 the sidewalk that runs along the east face of the
20 building joins the -- and actually comes into the
21 sidewalk that runs across the front of the building,
22 which would be the north face.
23 Q. Okay. In regard to that seam there, did she
24 identify which edge she tripped on or --
25 A. I -- if I remember correctly, it was this edge

Page 24

1  here, which she was traveling out of the building
2  traveling east on her way to her car, which is parked on
3  that side of the building. And she tripped on the edge
4  of the sidewalk that was running along the north face of
5  the building and was -- became part of the other
6  sidewalk, intruded into it, I guess, by a little bit, by
7  about two or three feet.
8  Q. She tripped on the east edge of that?
9  A. Yeah, she tripped -- well, she tripped on the
10 west edge of the sidewalk section that was running along
11 the east side of the building.
12 Q. In regard to that seam that we're talking about,
13 is it fair to say there's just one piece of cement there
14 that has the tapered edges to it? Do you recall that?
15 A. There's one piece of concrete that -- one large
16 section that's probably four-by-six or eight and, yeah,
17 where that extends into the sidewalk at the front of the
18 building, it's raised slightly and there's a rounded edge
19 there, yeah.
20 Q. Okay. Along that, the east seam there, did she
21 say -- was she more towards the north or more towards the
22 south when she fell or did she describe it at all to you?
23 A. No, she wasn't -- I don't remember her being
24 real specific. It was just right in this area here,
25 probably more -- I had the impression in talking with her

Page 25

1  that this was in this area here, more to the north end of
2  this edge.
3  Q. Okay. Did she describe her fall in any way, as
4  to what foot tripped or --
5  A. Not. What I remember, she just went over and
6  hit her face, is what was told and what I remember.
7  Q. Okay. Going back one step, have you taken any
8  courses or done any study in human factors or any of that
9  area as to how people react and how bodies react?
10 A. No.
11 Q. Have you taken any courses or any classes or
12 seminars specifically in regard to sidewalk design?
13 A. Well, we're -- I guess specifically, no. I'm
14 sure they must exist, but generally speaking, civil
15 engineers are grounded in general principles of concrete
16 and design and code requirements, and we take off and do
17 it. I mean, I've written specs for sidewalks over my
18 years of practice and they're pretty standard, pretty
19 bump and grind stuff, nothing real special about them.
20    If you want to get into super flat floors for
21 warehouses, that's a different story, but sidewalks are
22 pretty straightforward.
23 Q. When you say straightforward specs, what kind of
24 specs go into a sidewalk?
25 A. Well, you've got several sections. Obviously,

Page 30

1  It's just kind of fine tuning that drives you nuts that
2  happens.
3      In general, things move forward pretty much the
4  same. They very seldom go back and make anything less
5  restrictive.
6      Q. But sitting here today, you can't point to any
7  provisions within the 2003 IBC code that reference the
8  accessibility standard similar to 4.52 of the ADA --
9      A. Sitting here in this room right now, no. With
10 a -- given a few minutes with the code, I could probably
11 produce that, certainly for trial.
12     Q. When you measured the difference in height at
13 this particular location, how do you do your
14 measurements? Is it from the bottom of the crack between
15 the two pieces of cement or is it from a different point?
16     A. Yeah, it would be basically from -- if you've
17 got two pieces of concrete sidewalk, you'll measure from
18 the base of one to the top of the other. Basically top
19 to top, and whatever the difference is is what the
20 measurement would be.
21     Q. Okay. In regards to the piece of concrete we're
22 dealing with here, it has a general flat surface but then
23 the edges are tapered about two or three inches out.
24 What counts as the top of that block of concrete for
25 measurement purposes?

Page 31

1      A. I don't understand quite what you're saying, but
2  let's look at the picture.
3      Q. For example, the last picture in Exhibit 3, you
4  can see the tapered edge where they used a cement tool.
5      A. They flattened that out with a trawl.
6      Q. They use a trawl and it tapers down the edge
7  about a quarter to a half an inch; is that consistent
8  with your memory?
9      A. My memory is that that -- yeah, there's a gap or
10 drop there. I doubt -- it's probably not more than a
11 quarter inch, probably more than like an eighth.
12 Typically that's what they do.
13     For all intents and purposes, there's not much
14 difference between this, what you're calling a raised
15 section and the perimeter edge here. It's --
16     Q. Let's assume that there was a significant
17 difference, what counts as the top of that cement -- that
18 piece of cement for measurement purposes?
19     A. It would be the edge at the -- adjacent to the
20 slab.
21     Q. What if the gap between the two slabs was, let's
22 say, four inches, does that present different issues as
23 far as measuring the height between the slabs?
24     A. I'm not really prepared to discuss that. That
25 becomes a gap. And that affects the way people perceive

Page 32

1  things. And -- yeah, that's -- to me, I don't have an
2  opinion on how that would affect my opinion.
3      Q. Are there code provisions that apply to gaps?
4      A. You're not supposed to have gaps in an exit or a
5  sidewalk. I mean, I guess that would be the provision
6  that would apply, you're supposed to have a continuous
7  flat surface.
8      Q. But sidewalks are not continuous flat surfaces,
9  are they?
10     A. They're supposed to be.
11     Q. But they're not poured as one piece of concrete?
12     A. That is correct. But as long as they butt
13 together, they're considered continuous.
14     Q. When we say butt together, how close to do they
15 have to be together?
16     A. Ideally -- that depends on the type of joint.
17 You've got expansion joints and control joints. In this
18 sidewalk here these appear, just looking at them, to all
19 be control joints. So they would have troweled down each
20 side and created a weakened plane by breaking this joint
21 down a third of the depth of the concrete, so that the
22 crack would occur in the joint, as opposed to into the
23 surface. I'm not sure quite what happened here.
24     I don't remember, and it's not obvious from this
25 photograph, this appears to be what would be called an

Page 33

1  expansion joint. In that case they put a half-inch,
2  anywhere from a quarter- to a half-inch piece of mastic.
3  It's usually fiberboard impregnated with asphalt to allow
4  the -- for thermal expansion between the different
5  lengths of concrete so that you don't end up with a
6  buckle when it gets hot.
7      So sidewalks generally don't have a gap of more
8  than a half an inch, or they shouldn't if they're
9  constructed properly.
10     Q. Is there any specific code provisions that
11 address that gap?
12     A. No. I -- I -- other than the portions of the
13 code that say you're supposed to have a continuous
14 surface, and those provisions accept the reality of
15 construction, which is that you've got to have expansion
16 joints.
17     Q. In regard to concrete, often the edges are
18 troweled one way or another. Are there any provisions
19 regarding how the edges of the concrete can be troweled,
20 what sort of curve or how much difference --
21     A. No. Again, standard in the industry, I'm sure
22 if somebody was to go way out on a limb and put a
23 two-inch radius on the edges of their sidewalk, you know,
24 in the area of travel, that they probably would get
25 called by the Municipality.

Page 34

1  So you can go into any hardware store, Alaska
2  Industrial Hardware, and buy trowels. They've got
3  standard edges. What that radius is, I don't know. It's
4  pretty much accepted by the industry and that's what you
5  get. Probably quarter-inch radius, or something like
6  that.
7      Q. In this particular case the troweled piece of
8  concrete, it's troweled differently than the adjoining
9  pieces of concrete, correct?
10     A. It appears that there was some attempt to fill
11 in what was a flower bed or a planting area. And that
12 that -- and I say that simply because the finish on that
13 particular concrete was different than what you see
14 everywhere else.
15     Q. It appears to have been laid at a later date?
16     A. Could be a later date. Certainly a different --
17 at a different time.
18     Q. It's right on that corner where people may have
19 traveled over the flower bed, or something?
20     A. It -- as I remember it, that extends all the way
21 back -- that extends all the way back to the door. It
22 looks to me like at one time they thought they wanted to
23 have a planting bed in there. And the reality of it is
24 it's on the north side of the building. And it's
25 undercover. And things didn't grow well there. And they

Page 35

1  just ended up with an eyesore, so they filled it in. But
2  I have no basis for that, other than just -- just knowing
3  something about what grows up here, since that's one of
4  my hobbies. And I suspect that's what happened.
5      Q. I think it says in your report that it appears
6  the pieces of cement had moved due to frost heaving
7  and/or settling; is that your opinion?
8      A. I'll have to go look and see what I said.
9         Yeah, I say it was not clear whether the
10 difference was due to frost heave or settling of sections
11 of the sidewalk.
12     Q. Do you have any opinion at all as to why the
13 difference in elevation exists?
14     A. My guess is that it settled. And I say that
15 because, looking at these pictures and looking at -- my
16 pictures were taken in the winter. These pictures, I
17 don't see any snow on the ground. And I've been there
18 recently. And this is -- this piece of concrete's pretty
19 much -- stayed as it shows there. So my guess is that
20 there isn't any frost heave going on. And if there
21 isn't, it probably was settlement.
22     Q. Either frost heaving or settlement, are those
23 uncommon in sidewalk situations here in Anchorage?
24     A. Uncommon, no.
25     Q. Had you ever been to this location prior to

Page 36

1  being retained in this case?
2      A. Sure. My offices are right across the street.
3  So -- although that -- and over the years the Cattle
4  Company's been kind of a hangout, so it's gone through a
5  lot of incarnations and I was part of some of those,
6  so --
7      Q. When you say you were part of some of those, did
8  you ever participate at all in any of the design?
9      A. Not any of the design. I participated in the
10 partying that went on inside.
11     Q. Had you ever noticed that piece of concrete
12 before?
13     A. No.
14     Q. Any particular reason you would notice or not
15 notice it?
16     A. No.
17     Q. Had you ever stumbled there before?
18     A. No.
19     Q. Do you think you had crossed that location
20 before?
21     A. Probably not. I usually don't park on this side
22 of the building.
23     Q. You said several times that sidewalks are
24 supposed to be continuous surfaces. What provision of
25 the code applies to that?

Page 37

1      A. Well, the -- the sections that talk about
2  exiting talk about landings being level surfaces or
3  sloped surfaces, but not discontinuous surfaces.
4      Q. Is this considered a landing, the location of
5  this accident?
6      A. The code often speaks to general areas that --
7  that are then carried on forward. So -- so,
8  in other words, it's understood that you're not going to
9  have ups and downs in any means of egress. And this
10 sidewalk would still be considered a means of egress from
11 the building.
12     Q. When does a landing or a means of egress become
13 a sidewalk or something different?
14     A. When you exit a building and the exit opens onto
15 a sidewalk, then that becomes a means of egress.
16        And there are standards; specifications for
17 sidewalks require that they be level, that there be no
18 change in elevation between the different pieces of it
19 after it's done. And slabs are the same way, they're
20 required to be, you know, not more than quarter-inch out
21 of level in ten feet so -- they're just -- obviously, if
22 we have a sloping site, then sidewalks are going to slope
23 with the site. But within that slope, they're supposed
24 to maintain continuity of elevation, so that you don't
25 trip. That's the whole point, is trying to not trip.

Page 38

1  Q. I understand there are standards for making
2  sidewalks. We talked about settling. We talked about
3  freezing. I'm going to assume tree roots can push out
4  pieces of sidewalk?
5  A. Yes, they can.
6  Q. Is that a code violation when the piece of
7  sidewalk becomes unlevel with the adjoining piece?
8  A. Yeah, I would -- I would say that it would be a
9  code violation.
10  Q. Is there any enforcement of those violations?
11  Is that something, you call the Municipality of Anchorage
12  and they'll enforce the code?
13  A. No. You could call them, and they probably
14  should -- I -- I guess I don't have an opinion on that,
15  because I haven't done it, so --
16  Q. If you were the officer to say that this
17  sidewalk was a code violation, what provision would you
18  cite?
19  A. I would go back to the sections that say that --
20  that the maximum difference in elevation that you're
21  allowed on any path of egress is a half-an-inch. And
22  that happens at doorways or thresholds. And that's the
23  exception that's made because, as a practical matter, you
24  need to have a threshold in a doorway.
25  Q. Now, in your report you cite section 1008.1.6

Page 39

1  for thresholds. Where is the provision that says
2  sidewalks can't be out of level? Or that -- is there any
3  provision that says -- that says this, the egress has to
4  be continuous?
5  A. There is a section. I guess the assumption is
6  that -- and it's -- it -- I would have to go back and see
7  if I could track down the section, but the assumption of
8  all codes is that the floors are level. That's why you
9  can walk across the lobby here and not end up with
10  changes in floor level, even though it might be
11  convenient, and have tripping hazards.
12  Q. That's an assumption of the code, but it's not a
13  provision of the code.
14  A. Well, it is -- they have accepted the flatness
15  at doorways. So they've given you -- they've allowed
16  that there be a half-inch exception to flat when you walk
17  through a door. I mean, otherwise you wouldn't be
18  allowed that, otherwise you would have to have a flat
19  level means of travel through doorways, which is
20  impractical.
21  Q. I'm not arguing what's smart design or what's
22  good design.
23  A. Sure.
24  Q. But is there a provision that says we're going
25  to have flatness? Is there a specific provision?

Page 40

1  A. I would say that, yes, there probably is. I
2  don't have access to it here today. But I can tell you
3  for sure that it is understood.
4  Q. How about in this particular case at the Cattle
5  Company, the curb out to the parking lot, that appears to
6  be out of flat, that's an exception to the flatness of
7  where people walk?
8  A. You're allowed to have rises at stairs and curbs
9  up to seven inches. So I'm -- I mean, so between your
10  street and the typical height for a curb is six inches,
11  but the code allows for stairways a maximum rise or
12  height of seven inches.
13  Q. Is there a minimum rise or height?
14  A. I think it's four. I would have to go back and
15  look. But, yes, they do have a maximum/minimum for the
16  same reason, they don't want -- there is a certain level
17  that people don't perceive well. And so you -- tripping
18  becomes a problem, too, so they define a minimum stair
19  riser height and a maximum.
20  Q. When you say there's a point people don't
21  perceive well, what is the basis of that opinion? What
22  background --
23  A. That's just general conversation with my
24  colleagues over the years.
25  Q. Any colleagues with particular psychological

Page 41

1  training?
2  A. No, just general conversation.
3  Q. Engineering colleagues?
4  A. And architectural colleagues.
5  Q. Is there a minimum height for curbs? Is that
6  the same as stairs, or --
7  A. You know, I don't know if there's a minimum
8  height. The Muni has standards for curbs. You can have
9  a rolled curb. You can have a curb for handicapped
10  access. And the -- I believe the -- I'd have to go take
11  a look at the typical detail, I think it probably rolls
12  down to about an inch or half-an-inch, something like
13  that. Those are just standard details that are put out
14  by the Muni.
15  And so the six inches works well. That's
16  usually the curb that we adopt and use in our projects.
17  Although, as I said, they have specific details for --
18  approved details for a handicapped access from a sidewalk
19  to a street.
20  Q. I think we're just about done. Just a second
21  here.
22  You would agree this sidewalk is not a landing
23  or a threshold; is that a fair statement?
24  A. Uh-huh.
25  Q. That's a yes?

Page 42

1   A. Yes. Beyond the swing of the door, it's not.
2   Q. Okay. I don't have any further questions.
3              EXAMINATION
4   BY MR. JURASEK:
5   Q. Just one quick, regardless if there's an actual
6   code violation, does this design of this sidewalk or its
7   current condition create a trip hazard?
8        MR. EARNHART: Foundation.
9        THE WITNESS: In my opinion, yes.
10       MR. JURASEK: No further questions.
11       MR. EARNHART: All right.
12          (Whereupon, the deposition was concluded
13          and reading and signing of said deposition
14          was not waived.)

Page 43

1           WITNESS CERTIFICATE
    MARLENE MEYER VS. ARG ENTERPRISES CASE NO. 3:05-cv-00239
2   RICHARD BUTTON       Taken Septmber 28, 2006
    I hereby certify that I have read the foregoing
3   deposition and accept it as true and correct, with the
    following exceptions:
4   ===============================================
5   Page  Line        Reason For Change
6   ===============================================
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  Date Read        (Sign name here)
23
24  (Use additional paper to note corrections as needed,
25  dating and signing each one.)

Page 44

             REPORTER'S CERTIFICATE

    I, Britney E. Chonka, Court Reporter, hereby
certify:
    That I am a Court Reporter for Alaska Stenotype
Reporters and Notary Public in and for the State of
Alaska at large. I certify Hereby that the forgoing
transcript is a true and correct transcript of said
proceedings taken before me at the time and place stated
in the caption therein.
    I further certify that I am not of counsel to
either of the parties hereto or otherwise interested in
said cause.
    In witness whereof, I hereunto set my hand and
affix my official seal this 10th day of October, 2006.


                    _____
                    BRITNEY E. CHONKA, REPORTER
                    Notary Public - State of Alaska

Exhibit _C_

Page _6_ of _6_ Pages